UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                         )
ORLANDO RIVERA                           )
                                         )
            Plaintiff,                   )
                                         )
v.                                       )        Civil Action No. 13-10602-NMG
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
            Defendant.                   )
_____)

REPORT AND RECOMMENDATION ON
PLAINTIFF'S MOTION TO REVERSE OR REMAND
AND DEFENDANT'S MOTION TO AFFIRM

March 27, 2014

SOROKIN, C.M.J.

   The Plaintiff, Orlando Rivera, seeks reversal of the decision of the Defendant, Acting

Commissioner of the Social Security Administration ("the Commissioner") denying his disability

benefits, or alternatively seeks to remand the case for further findings. The Commissioner seeks

an order affirming her decision.

   For the following reasons, I RECOMMEND that the Court DENY the Plaintiff's Motion

to Reverse or Remand the Decision of the Commissioner (Docket # 17) and ALLOW the

Commissioner's Motion to Affirm the Commissioner's Decision (Docket # 19).

I.     BACKGROUND

   A.     Procedural History

   On April 12, 2010, Rivera filed an application for Social Security Disability Insurance

benefits, alleging that he suffered from HIV, diabetes, high blood pressure, and neuropathy in his

feet, with an onset date of May 30, 2009.  Docket ## 22-5 at 2 and 22-6 at 7.[1]  On May 4, 2010,

the Commissioner denied his application.  Docket # 22-4 at 2-4.  On June 18, 2010, Rivera made

a Request for Reconsideration.  Id. at 7.  On September 10, 2010, having had Rivera's claim

independently reviewed by a physician and disability specialist, and considering anew all the

information regarding Rivera's medical conditions as well as his depression and anxiety, the

Commissioner upheld the previous denial.  Id. at 8.  On November 9, 2010, Rivera requested a

hearing before an Administrative Law Judge ("ALJ").  Id. at 11.  A hearing was conducted on

November 10, 2011, before ALJ Constance D. Carter, which included testimony from an

impartial vocational expert.  Docket # 22-2 at 27-64.

    B.    Rivera's History

    At the time of the hearing before the ALJ, Rivera was forty-nine years old.  Docket # 22-

2 at 31.  He was married with no children.  Id. at 36.  Although Rivera noted in a state agency

Disability Report that he had completed the eleventh grade, Docket # 22-6 at 8, he testified at the

hearing before the ALJ that he had only completed the ninth grade, Docket # 22-2 at 32.

    Rivera last worked in August, 2011, hosting karaoke.  Docket # 22-2 at 32.  He stopped

working at karaoke hosting because standing for long periods of time hurt his back and feet.  Id.

at 33.  He had worked previously managing a liquor store.  Id. at 34.  He was fired from that job

for cause.  Id. at 34-35.  Afterward, he collected unemployment insurance until it expired, at least

to December of 2010.[2]  Id.; Docket # 22-8 at 156.  In order to collect unemployment insurance,

Rivera represented that he was ready, willing and able to work.  Docket # 22-2 at 35-36.

---

[1] Citations throughout are to the pagination assigned by the Court's CM/ECF docketing system, rather than to any pagination internal to the exhibits themselves.
[2] Apparently, the company did not protest Rivera's collection of unemployment.  Docket #22-2 at 34-35.

Rivera's medical records include the following:

- On April 28, 2010, Rivera became a new patient at the Brockton Neighborhood Health Center. Docket # 22-7 at 145-46. The record of his initial visit indicates the following: "Patient states he has been HIV positive for 30 years and has been on a number of regimens. He [has] had good HIV control." Id. at 145. It notes that Rivera's diabetes with neurological manifestations "is suboptimally controlled due to noncompliance with diet and excessive alcohol intake." Id. at 146. The provider wrote the following: "Had a frank discussion with the patient about his alcohol misuse. He should not be drinking at all. . . . I will recommend he start attending Alcoholics Anonymous meetings." Id.

- On June 3, 2010, Rivera saw an unspecified health provider, possibly Timothy Comeaux, LICSW, at the Brockton Neighborhood Health Center. Docket # 22-8 at 49-52. The record logs a current Global Assessment of Functioning ("GAF") score of 63. Id. at 52.

- On June 21, 2010, Rivera saw his treating therapist, Timothy Comeaux, LICSW, at the Brockton Neighborhood Health Center for Individual Therapy. Docket # 22-8 at 47-48. Mr. Comeaux worked with Rivera on a treatment plan which included identifying strategies to feel more comfortable on stage at karaoke, finding an AA group to attend weekly, developing coping skills to manage/reduce depressive symptoms, identifying precipitants of Rivera's depression and underlying feelings, develop a nutrition plan, and set up an exercise plan. Id.

- On September 8, 2010, Rivera went to the Brockton Neighborhood Health Center for Individual Therapy.[3] Docket # 22-8 at 43-44. The record indicates that Rivera had not been to see the social worker for a while, and that Rivera discussed a camping trip he

_____
[3] Presumably, Rivera saw Timothy Comeaux at this visit. There is no signature page with the medical record, however.

took over Labor Day weekend.  Id. at 43.  In addition, "Pt. drinks less at karaoke night and has not been driving under the influence.  Pt.'s mood has not been overly depressed." Id.  Rivera's GAF score was 67.  Id. at 44.

- On January 25, 2011, Rivera went to the Brockton Neighborhood Health Center for Individual Therapy.  Docket # 22-8 140-41.  Comments in the record state the following: "PT. got a Y gym membership about a week and a half ago.  Pt. went 3 times last week and plans to go daily moving forward – doing cardio some days and other training other days.  Pt. has been watching his portion sizes at meal time and cutting back on drinking. Pt. had 5 beers during karaoke on Saturday and 7 on Sunday – this is reduced from an average of about 12 in the past on these nights. . . . Pt. feels his mood has been better since he restarted his anti-depressant and started going to the gym.  Pt. plans to continue going to the gym regularly and cutting back on his alcohol intake.  Pt. and partner made dinner last night instead of going out to dinner, as they are trying to cut back on restaurant expenses."  Id. at 140.

- On March 30, 2011, Rivera saw his treating physician, Benjamin Lightfoot, M.D., at the Brockton Neighborhood Health Center for a sick visit, having respiratory congestion and a sore throat.  Docket # 22-8 at 114-16.  Dr. Lightfoot wrote: "The patient's HIV disease, is stable on current regimen.  The patient's CD4 count is stable and has excellent viral suppression, . . . Compliance is excellent. . . . Dramatically improved control [of Diabetes with neurological manifestations, type II] most likely due to the fact that the patient has stopped drinking."  Id. at 115.

- On April 7, 2011, Rivera saw his treating physician, Benjamin Lightfoot, M.D., at the Brockton Neighborhood Health Center for a "Treatment Plan Review."  Docket # 22-8 at

108-109.  In his Clinical Assessment of Rivera, the Doctor noted Major Depression, Alcohol Abuse, and HIV, and "Current GAF: 67 on 9/8/2010."  Id. at 108.  In his treatment plan he wrote: "Problem 1: Alcohol Use[;] Goal Pt. would like to be comfortable in social situations without using alcohol . . . Problem 2: Depression[;] Goal Alleviate depressive symptoms . . . Problem 3: Pt. is not happy about the way he looks[;] Goal Pt. would like to lose 20 pounds in 3 months . . . Summary of Progress to Date: Pt. has not [drunk] alcohol for 22 days.  His liver is enlarged and he is actively taking steps toward healing his liver.  Pt. has been more active around the house with chores and processing the mail, bills, etc.  Pt. has started a Y membership 2 months ago but has not been working out lately."  Id. at 109.

- On August 18, 2011, Rivera saw Timothy Comeaux, LICSW, at the Brockton Neighborhood Health Center for Individual Therapy.  Docket # 22-9 at 29-31.  Mr. Comeaux commented that Rivera would be starting back at his karaoke gig at the country club and that "Pt. feels all 3 treatment plan goals – reduced drinking, reduced depression, and weight loss, are tied in together."  Id. at 29.

- On August 25, 2011, Rivera saw Johann Hepner, NP, for an "Initial Psychiatric Evaluation."  Docket # 22-9 at 24-28.  Ms. Hepner indicated the reasons for Rivera's visit were depression and adjustment of his Celexa medication.  She wrote: "The patient reports it is somewhat difficult to meet home, work, or social obligations.  Context: alcohol use and social isolation."  Id. at 24.  The record notes that Rivera had a history of alcohol use, had a sedentary activity level, previously was a health club member, had hobbies including painting and karaoke, and had dogs in the house.  Id. at 25.  On Rivera's alcohol use, Ms. Hepner wrote: "The patient drinks alcohol.  Alcohol use began

at 21 years of age. Beer and liquor Frequency: 3-4x week – about[,] binge drinker. Last drink was two [days] ago. Patient has never sought treatment for alcohol abuse. Patient reports having experienced withdrawal problems, seizures or blackouts from alcohol or drugs. Patient has not been involved in a 12-step program for alcohol abuse. Patient has required emergency medical attention for intoxication 2 time(s). Family history positive for alcoholism, including father, mother, grandfather, and siblings[.]" Id. As to depression, she wrote: "Pt. has some symptoms of depression. Duration and intensity do not qualify for a Major Depressive episode, however pt. has been consistently taking Celexa for the past year. . . . Has some problems with alcohol including DUIs >20 years ago, per pt report, but also had recently [driven] car into ditch d/t alcohol intoxication." Id. at 27. "Current GAF: 67 on 09/08/2010." Id.

- On September 1, 2011, Rivera saw Timothy Comeaux, LICSW, for Individual Therapy. Docket 22-9 at 21-23. Mr. Comeaux noted that Rivera went fishing with a neighbor, started a karaoke job at country club, plans to continue cutting back on his drinking and improving his diet, and that his mood has been better. Id. at 21. "Current GAF: 67 on 09/08/2010." Id. at 22.

- On September 14, 2011, Rivera saw Johann Hepner, NP, for a "Med Management-Complex" visit. Docket # 22-9 at 17-20. She noted that when Rivera keeps himself busy he is less depressed, and wrote that Rivera "drank last [T]hursday. Had multiple drinks, intoxicated, had a ride home. Knows that increases sugars, not helpful for situation." Id. at 17.

- On September 16, 2011, Rivera saw John Guttell, MD regarding joint pain. Docket 22-8 at 178-83. Dr. Guttell observed Rivera to be alert with normal gait. Id. at 178. Upon

examination of Rivera, Dr. Guttell noted that Rivera's hands were "mildly tender over the PIP joints. . . . His wrists elbows and shoulders were fine. Hips have full range of motion without any tenderness over the trochanteric bursa her SI joints. His knees have some crepitus on the right with a small effusion. He does have full flexion and extension bilaterally. His ankles and feet were fine." Id. In his "Review of Systems," Dr. Guttell noted that Rivera had no diarrhea and no depression. Id. at 178-79;

- On September 19, 2011, Rivera saw Timothy Comeaux, LICSW, at the Brockton Neighborhood Health Center for Individual Therapy. Docket # 22-9 at 14-16. Mr. Comeaux's write-up states: there was no change in Rivera's mental status; "pt. has new karaoke gig"; "Pt. been drinking at country club karaoke gig and instead has been bringing Crystal Light to the gig. Pt. plans to not drink at Friday's gig at The Alamo since he and partner are having a cookout on Saturday that will involve drinking. Pt. states that his network mostly includes people who drink or smoke marijuana regularly. Pt. has appt. with diabetic nutritionist upcoming and plans to ask whether insulin treatment can cause weight gain, and how alcohol influences treatment and diabetes in general. Pt. plans to go to [the] gym with either of two friends . . . but pt. has not started yet since his back has been hurting." Id. at 14. "Current GAF: 67 on 09/08/2010." Id. at 15.

- On October 19, 2011, Rivera saw Johann Hepner, NP, at the Brockton Neighborhood Health Center. Doc. No. 22-9 at 2-6. The record notes: "Reason(s) for visit" – "1. depression (follow-up) Mood: 'Good' continues to be off and on. 2 to 3 times per week feeling depressed. Lasting about all day, worsening of depression and anxiety when paying bills. Typically will lay in bed and watch TV, increased appetite. Appetite:

'good' sugars have been good. . . . No alcohol in diet, difficult. Stopped cold turkey. . . . Plans on having one [drink] on Halloween. Hopes will be able to stop at just one, will tell Bartender. . . . activity: has gone to the Y can not work out as much as would like. . . . Date of initial visit for this episode [of depression]: 8/25/2011. He is experiencing diminished interest . . . poor concentration[.]" Id. at 2. With respect to Rivera's mental status Ms. Hepner reported that his appearance and speech were appropriate; mood was depressed; behaviors unremarkable; memory intact; attitude hopeful; reasoning, impulse control, judgment, and insight are fair; and thought processes were logical. She recorded his "Current GAF" as "67 on 9/8/2010." Id. at 4.

C.      The Administrative Decision

In making the decision to deny Rivera's request for disability benefits, the ALJ conducted the familiar five-step sequential evaluation process which determines whether an individual is disabled and thus entitled to benefits. See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health and Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982); Docket # 22-2 at 12-13. The ALJ first found that Rivera had not engaged in substantial gainful activity since May 30, 2009. Docket # 22-2 at 13.

The second inquiry was whether Rivera has a "severe impairment," meaning one which "significantly limits [his] physical or mental capacity to perform basic work-related functions." Goodermote, 690 F.2d at 6; 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ determined that Rivera suffers from severe impairments of diabetes mellitus with peripheral neuropathy, HIV, major depressive disorder, anxiety disorder and alcohol abuse. Docket # 22-2 at 14.

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the

Social Security Regulations. 20 C.F.R. § 404.1520(a)(4)(iii); <u>Goodermote</u>, 690 F.2d at 6. If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ found that Rivera's severe impairments of diabetes mellitus with peripheral neuropathy and HIV did not meet, or medically equal, the listed impairments. Docket # 22-2 at 14-15. She also found that Rivera's mental impairments, did not meet or medically equal the criteria of the listings. <u>Id.</u> at 15.

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); <u>Goodermote</u>, 690 F.2d at 7. Whenever, as here, there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must evaluate the claimant's RFC and then determine if the claimant, in light of his RFC, can perform his past relevant work. 20 C.F.R. § 404.1520(e). An individual's RFC is his ability to do physical and mental work activities on a sustained basis, despite limitations from his impairments. 20 C.F.R. § 404.1545. Here, the ALJ found that Rivera had the RFC to do light work, with an option to alternate sitting and standing every thirty minutes, with standing/walking limited to two hours total, and with use of a cane. Docket # 22-2 at 16. She also found that Rivera must avoid climbing and exposure to hazards such as heights and moving machinery, and that he is limited to no more than occasional pushing and pulling with his legs, and is limited to no more than simple routine tasks. <u>Id.</u> In doing so, the ALJ concluded that while Rivera's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, nevertheless, Rivera's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment" described, <u>supra</u>. <u>Id.</u> at 16-17.

"Overall, the longitudinal objective medical evidence does not support the claimant's subjective allegations of totally disabling physical symptoms, as well as shows alcohol use contributing to the claimant's physical condition." Id. at 17. The ALJ also noted that Rivera reported engaging in "an array of activities, which further do not support his subjective allegations." Id. She found Rivera to have no more than a mild restriction in his activities of daily living and his social functioning because of his mental symptoms. Id. at 18. The ALJ gave little weight to the check-the-box assessment of the state agency's mental consultant that Rivera experienced moderate limitations in his daily activities and in maintaining concentration, persistence and pace, because she found it to be inconsistent in severity with Rivera's reports of his activities. Id. at 19. In addition, she found it to be inconsistent in severity with the medical record "containing no evidence of any partial or inpatient psychiatric hospitalizations unrelated to substance use." Id. Similarly, the ALJ gave little weight to the opinions of the consultative psychologist (who opined that Rivera has marked functional limitations, limited ability to manage stress, is unable to function in a work setting in a meaningful reliable manner, and has severely compromised functioning independent of his alcohol use) and of a treating M.D. (who determined, apart from alcohol use, marked limitations in Rivera's ability to deal with work setting changes and moderate limitations of his ability to perform simple instructions, make simple work-related decisions and socialize appropriately) because the ALJ found them to be inconsistent with the medical record "showing a significant history of alcohol abuse," and with Rivera's own reports of his symptoms and activities. Id. at 19-20.

It was Rivera's burden to show impairments severe enough to prevent him from doing his past work. See 20 C.F.R. § 404.1512(a), (c); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982). As a result of the

ALJ's RFC determination, and based upon the record and the hearing testimony, the ALJ concluded that Rivera would be unable to perform his past work of dancehall host, store manager, or liquor store manager, all of which require light exertion, because the work demands exceeded Rivera's specific RFC limitations.  Id. at 20.

At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work found in the national economy.  Id. § 404.1520(a)(4)(v).  It is the ALJ's burden to come forward with "evidence of specific jobs in the national economy that the applicant can still perform."  Seavy, 276 F.3d at 5.  Here, the ALJ found that there are jobs that exist in significant numbers in the national economy that Rivera could perform.  Docket # 22-2 at 20-21.  The ALJ accepted the vocational expert's testimony at the hearing that given Rivera's limitations, he would be able to perform representative sedentary occupations such as telemarketer.  Id. at 21.  Accordingly, the ALJ made a finding that Rivera is "not disabled."  Id.

II.     STANDARD OF REVIEW

The District Court may enter a judgment affirming, modifying, or reversing the Commissioner's decision (with or without remanding for rehearing), but the Court may not disturb the Commissioner's findings where they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion.  Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Determinations of credibility and the resolutions of conflicts in the evidence are for the Commissioner and not for the doctors or for courts.  Id.  Although an administrative record might support multiple conclusions, a court must uphold the Commissioner's findings wherever a reasonable mind, reviewing the evidence in the record as a

whole, could accept it as adequate to support them.  Irlanda Ortiz v. Sec'y of Health & Human

Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).  A denial of benefits, however, will not be

upheld where there has been an error of law in the evaluation of the claim.  See Manso-Pizarro v.

Sec'y of Health & Human Services, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam).  Similarly, a

denial will not be upheld where the finding of the Commissioner is not supported by substantial

evidence.  Id.; 42 U.S.C. § 405(g).

III.    DISCUSSION

        Rivera contends that the Commissioner's decision is not based on substantial evidence

and that the Commissioner erred as a matter of law in denying Rivera Social Security Disability

Insurance Benefits.  Rivera challenges the ALJ's findings in three respects: (1) he asserts that the

ALJ erred by substituting her opinion for the uncontroverted medical opinions of the treating

physician and the state agency's reviewing consultant with respect to Rivera's mental

impairments, and concluding that Rivera's mental impairments had no impact other than to

restrict him to simple tasks; (2) he asserts that the ALJ improperly rejected the vocational

expert's opinion that, assuming Rivera had more than a mild mental impairment, he would not be

able to perform substantial gainful activity; and, (3) he asserts that the ALJ erred by basing her

denial of Rivera's claim on non-medical evidence relating to Rivera's social activities, his

collection of unemployment insurance, and his problem with alcohol.

        A.    Crediting the Medical Opinions

        The Commissioner's Regulations state that an ALJ "will evaluate every medical opinion"

received.  20 C.F.R. § 404.1527(c).  ALJs commonly review assessments provided by three

categories of medical experts: sources who have treated the claimant for his impairments,

sources who have examined the claimant for purposes of rendering an opinion in connection with

his disability claim, and sources who have reviewed the claimant's medical records in order to render an opinion in connection with his claim but have not treated or examined him.  See generally 20 C.F.R. §§ 404.1527.  "[A] treating source's opinion on the question of the severity of an impairment will be given controlling weight so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  Polanco-Quinones v. Astrue, 477 F. App'x 745, 746 (1st Cir. 2012) (per curiam) (quoting 20 C.F.R. § 404.1527(d)(2)).[4]

Where an ALJ does not give controlling weight to a treating physician's opinion, she must determine how much weight to accord the opinion based on such factors as: "1) length of treatment relationship and frequency of examination; 2) nature and extent of the treatment relationship; 3) how well supported the conclusion is by relevant evidence; 4) how consistent the opinion is with the record as a whole; 5) how specialized the knowledge is of the treating physician; and 6) other factors that may be relevant."  Abubakar v. Astrue, No. 1:11-CV-10456-DJC, 2012 WL 957623, at *9 (D. Mass. Mar. 21, 2012).  She must give "good reasons" explaining her decision about what weight should be accorded to a treating source's opinion.  20 C.F.R. § 404.1527(c)(2).

The opinions of other examining and non-examining sources are accorded weight based on the extent to which they are supported by relevant evidence, whether they are consistent with the rest of the medical record, the level of specialized knowledge demonstrated by the source, and any other relevant factors.  Abubakar, 2012 WL 957623, at *11; 20 C.F.R. § 404.1527(c).  In general, opinions rendered by doctors who have examined the claimant are accorded more weight than those offered by sources who have not done so.  20 C.F.R. § 404.1527(c)(1).

---

[4] Polanco-Quinones cites to 20 C.F.R. § 404.1527(d)(2).  However, by 77 Fed. Reg. 10,655, 10,656 (Feb. 23, 2012), paragraph (c) was removed and paragraphs (d) through (f) were redesignated as paragraphs (c) through (e).  Thus, what was paragraph (d)(2) in Polanco-Quinones, is now paragraph (c)(2).

Determination of the claimant's RFC is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(2). The ALJ is responsible for making the RFC evaluation, 20 C.F.R. § 404.1546(c), based on her assessment of all the "relevant medical and other evidence[,]" 20 C.F.R. § 404.1545(3), including opinions of State agency medical or psychological consultants. 20 C.F.R. § 404.1527(e). She is not bound by any findings made by State agency medical or psychological consultants. 20 C.F.R. § 404.1527(e)(2)(i); SSR 96-6P, 1996 WL 374180, at *1, *2 (July 2, 1996). Agency consultants are considered experts in the Social Security disability programs, however, and the ALJ may not ignore, and must explain the weight given to their opinions, unless a treating source's opinion is afforded controlling weight. 20 C.F.R. § 404.1527(e)(2)(i), (ii); SSR 96-6P, 1996 WL 374180, at *1, *2; McCollom v. Astrue, No. 11-30079-KPN, 2012 WL 2244798, at *5 (D. Mass. June 14, 2012). To evaluate the weight of an agency consultant's opinion, the ALJ applies "relevant factors . . . such as the consultant's medical specialty and expertise in [the Social Security disability] rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii).

Rivera asserts that his treating physician and therapist, his examining psychologist, and the State agency reviewing psychologist all agreed that Rivera had a significant mental impairment imposing limitations which, if credited, would prevent him from performing a telemarketer's job. He further contends that the ALJ improperly rejected all of these medical opinions solely on the grounds that they were contradicted by Rivera's testimony as to his activities. Specifically, he believes that the ALJ, in her assessment of Rivera's mental RFC, should have assigned him the additional impairments of limited concentration, the need to take multiple unscheduled breaks per day, and the need for health related absences of at least once per

month.  Had she done so, Rivera argues, she would have had to conclude that Rivera could perform no work and was, therefore, disabled.  Thus, Rivera concludes that the ALJ failed to carry her burden at step five in the evaluation process to show the existence of work in the national economy that Rivera could perform despite his impairments and she must be reversed. See Seavey, 276 F.3d at 5; Vazquez, 683 F.2d at 2.  Rivera's characterizations of the medical evidence and the ALJ's actions, however, are not supported by the record.  In particular, there was no consensus among the medical opinions that suggests the ALJ erred in not assigning the additional mental impairments.

### Treating Physician

Rivera's treating physician, Benjamin Lightfoot, M.D., from the Brockton Neighborhood Health Center, completed a physical evaluation of Rivera's ability to do work-related activities on a regular and continuous basis (Social Security Administration Form HA-1151-BK (04-2009)) on October 12, 2011.  Docket # 22-8 at 185-90.  Dr. Lightfoot assessed various aspects of Rivera's strength, movement, and dexterity.  He noted Rivera's neuropathy, arthritis, poor balance, and inability to tolerate adverse environmental conditions.  He marked that Rivera could perform all the activities listed on the form, including shopping, use of standard public transportation, preparing simple meals, care for personal hygiene, and sort, handle, and use paper/files.  Dr. Lightfoot made no remarks pertaining to Rivera's ability to concentrate, generally, or any need for multiple unscheduled breaks or health related absences from work.[5]

### Treating Therapist

Rivera's treating therapist, Timothy Comeaux, LICSW, from the Brockton Neighborhood Health Center, completed a mental evaluation of Rivera's ability to do work-related activities

---

[5] A State agency consultant, Bill Straub, M.D., completed a physical RFC assessment of Rivera on April 22, 2010, Docket # 22-7 at 129-36, in which he found Rivera to be physically somewhat less limited than Dr. Lightfoot later concluded in October, 2011.

(Social Security Administration Form HA-1152-U3 (04-2009)) on October 12, 2011, which Dr. Lightfoot co-signed. Docket # 22-8 at 191-93. The form defines moderate limitation to mean "more than a slight limitation in this area but the individual is still able to function satisfactorily." It defines marked limitation to mean a serious limitation in an area such that there is "a substantial loss in the ability to effectively function." Id. at 191. Mr. Comeaux assessed Rivera as having moderate limitation in his ability to understand, remember, and carry out simple instructions, and marked limitation in his ability to understand, remember, and carry out complex instructions; make judgments on complex work-related decisions; and respond appropriately to usual work situations and to changes in a routine work setting. Id. at 191-92. He noted Rivera's "bouts of depression," sleep issues, and "recent examples of mixing up days of appointments." Id. at 191. Mr. Comeaux wrote, "[Patient] does not always exhibit these symptoms that could cause moderate or marked impairment, but the symptoms are frequent." Id. He remarked that Rivera had had recent memory problems and difficulty paying his bills. While Mr. Comeaux did refer to recent instances of confusion and memory issues, as well as grogginess from sleep medication, he did not state that Rivera suffered generally from limited concentration, or that he would require multiple unscheduled breaks per day or at least one health related absence from work per month.

As to the impact of Rivera's alcohol use, Mr. Comeaux wrote, "[Patient] has had bouts of alcohol abuse at times in the past, but [patient's] depressive symptoms pre-existed those bouts. The alcohol use is not the major reason for [patient's] impairments." Id. at 192. The record, however, is replete with evidence of Rivera's longstanding alcohol abuse affecting his well-being, including a medical record from Fenway Health dated November 24, 2009, Docket # 22-7 at 48 (social history of alcohol abuse), and Rivera's initial office visit to the Brockton

Neighborhood Health Center on April 28, 2010. Docket # 22-7 at 145-46.[6] Upon physical examination at the Brockton facility at this initial office visit, Rivera was found to have "[n]o unusual anxiety or evidence of depression[,]" though it was noted that he had been "treated for depression in the past." Id. The record also notes that Rivera's diabetes "is suboptimally controlled due to noncompliance with diet and excessive alcohol intake." Id. at 146. Further linking Rivera's alcohol use to his symptoms, on March 30, 2011, Dr. Lightfoot wrote that control of Rivera's diabetes with neurological manifestations was "[d]ramatically improved [] most likely due to the fact that the patient has stopped drinking." Docket # 22-8 at 115. On September 14, 2011, Johann Hepner, NP, noted that Rivera knew drinking increased his sugars and was not helpful for his situation. Docket # 22-9 at 17. On August 18, 2011, Mr. Comeaux noted Rivera believed that reduced drinking, reduced depression, and weight loss were all connected. Id. at 29.

Thus, the ALJ gave little weight to Mr. Comeaux's (and Dr. Lightfoot's) conclusions, finding them "inconsistent with the medical record showing a significant history of alcohol abuse, as well as the claimant's own reports to treating and examining sources of improved symptoms . . . These opinions are also greatly inconsistent with the claimant's own reports of performing an array of activities, despite his mental impairments, . . . which especially does not support marked limitations of functioning." Docket # 22-2 at 19; see 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

Moreover, while Dr. Lightfoot co-signed the mental work-related activities assessment form, Mr. Comeaux, a social worker, performed the evaluation. Docket # 22-8 at 193. According to the Social Security regulations, social workers are not acceptable sources of

[6] This medical record does not show who the individual provider was.

medical opinions, though their lay opinions may be considered in light of such factors as "the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03P, 2006 WL 2329939, at *2-4 (Aug. 9, 2006); 20 C.F.R 404.1513(a). To the extent Dr. Lightfoot's endorsement of Mr. Comeaux's report elevates its conclusions to that of an acceptable medical opinion for the purposes of a disability evaluation, the ALJ was entitled to consider that a psychological evaluation was not within Dr. Lightfoot's area of expertise,[7] and weight the opinion accordingly. See 20 C.F.R. 404.1527(c)(5).

### Examining Psychologist

An examining psychologist, Jeffrey Schumer, Psy.D., evaluated Rivera once, on August 23, 2010, upon the referral of Dr. Lightfoot. Docket # 22-7 at 165-69. Dr. Schumer noted Rivera's self-report that he "has had a pattern of drinking about ten beers when he socializes for many years. However, he denied this to be a problem for him in social or work situations nor has he ever had any legal problems as a result of it." Id. at 166. Dr. Schumer observed that Rivera "presented as a cooperative, pleasant individual .. . exhibited good receptive and expressive language abilities[,] . . . displayed good persistence and solid frustration tolerance throughout the evaluation[,] . . . [and] maintained good on-task behavior, adequate attention, and an appropriate energy level during the evaluation." In measuring Rivera's cognitive/intellectual functioning, Dr. Schumer found Rivera to have "solid abilities[] in the area of language function[,]" scoring near the top of the average range in word knowledge, and earning a "solidly average score in his display of verbal abstract reasoning." Id. at 167. Rivera "also exhibited

---

[7] Dr. Lightfoot was Rivera's Primary Care Physician. Docket # 17-1 at 3.

solidly age-level ability to analyze and integrate abstract visual designs[, though he] showed a distinct weakness (borderline ability) in his display of visual abstract reasoning." Id. As to Rivera's social/emotional functioning, Dr. Schumer wrote, "Mr. Rivera's personality responses are clearly indicative of an individual who is experiencing moderate to severe feelings of depression, anxiety, somatic difficulties, and social concerns[,]" and that "Mr. Rivera seems to have limited capabilities for managing problematic situations." Id. at 167-68. Dr. Schumer proceeded to assign Rivera a GAF of 45, noting that his highest score within the past year had been 50. Id. at 169. This is inconsistent with the record, however. Two months earlier, on June 3, 2010, at the Brockton Neighborhood Health Center, Rivera was assigned a GAF of 63. Docket # 22-8 at 52. Furthermore, on September 8, 2010, two weeks after Dr. Schumer examined Rivera, Rivera's therapist (presumably Mr. Comeaux, though the signature page is not in the record) assigned Rivera a GAF of 67, id. at 44, which remained unchanged in the record thereafter. See, e.g., id. at 108 (April 7, 2011); Docket # 22-9 at 4 (October 19, 2011).

In summary, Dr. Schumer reported that Rivera was "experiencing marked functional limitations apparently due to medical problems as well as an affective disorder and an anxiety disorder. . . . Currently, Mr. Rivera's pattern of WASI scores can be suggestive of compromise in some of his cognitive resources (i.e., visual-spatial functioning)[.]" Id. at 168. Dr. Schumer concluded:

> Mr. Rivera's ability to function in a work setting in a meaningful, independent, and reliable manner at this point is severely compromised as the resources to cope with the responsibilities and stresses inherent in daily work task are adversely affected by the above-noted difficulties. These difficulties would be independent of his history of alcohol use.

Id. Nonetheless, Dr. Schumer recommended that "Mr. Rivera is encouraged to have a workup by an alcohol treatment specialist to determine whether he would benefit from any treatment for

his alcohol use." Id. at 169.  As above with respect to Mr. Comeaux's report, the ALJ supportably assigned little weight to Dr. Schumer's conclusion for being inconsistent with Rivera's significant history of alcohol abuse and his self-reports of improved symptoms and participation in an array of activities.  Docket # 22-2 at 19; see 20 C.F.R. § 404.1527(c)(4).

### State Agency Consultant

The remaining assessments of mental functioning consist of a psychiatric review technique ("PRT"), Docket # 22-7 at 170-82, and a mental RFC assessment, id. at 183-86, both completed by reviewing State agency consultant, Kathryn Collins-Wooley, Ph.D.  The PRT form allows for check-the-box assessment of the degree of a claimant's limitation in four broad categories of functional limitation.  There, Dr. Collins-Wooley marked that Rivera had a moderate degree of limitation regarding 1) the restriction of activities of daily living, and 2) difficulties in maintaining concentration, persistence, or pace.  Id. at 180.  She also marked that Rivera had one or two episodes of decompensation, each of extended duration.  Id.  The ALJ gave little weight to these conclusions, explaining:

> The opinion of the State agency mental consultant that the claimant has moderate limitation in daily activities and in maintaining concentration, persistence and pace as well [as] 1-2 episodes of decompensation, ([citing to Docket # 22-7 at 170-82, 183-86]), has been given little weight because it is inconsistent in severity with the claimant's own reports of performing an array of activities, despite his mental impairments, including: working at karaoke, ([citing to id. at 34-128 for 2009]); having a partner, hosting karaoke at a bar several times per week, ([citing to id. at 145-63 for June, 2010]); hosting karaoke several times per week, going camping over Labor Day, socializing ([citing to Docket # 22-8 at 39-77 for June, September, and October, 2010]); household chores, karaoke, going to the gym, going to a New Years Eve party, ([citing to id. at 100-75 for January and April, 2011]); karaoke, going to the beach with a friend, going fishing, ([citing to Docket # 22-9 at 2-105 for August and September, 2011]); working at karaoke until August 2011, driving, having friends, going camping ([citing to Docket # 22-2 at 27-64]). This opinion is also inconsistent in severity with the medical record containing no evidence of any partial or inpatient psychiatric hospitalizations unrelated to substance use.

Docket # 22-2 at 19.  There is no indication on the PRT that Dr. Collins-Wooley considered Rivera's performance of these activities in formulating her assessment.

The RFC assessment form measures the degree of limitation as to twenty types of mental activity and provides for a written Functional Capacity Assessment.  In Dr. Collins-Wooley's written assessment of Rivera's mental RFC (section III), she summarized:

> 48 [year old] with depression and anxiety in the context of somatic concerns and alcohol dependence.  He sleeps poorly and is low in energy and motivation but has sufficient focus to drive, shop, manage finances, and do some crafts.  He relates appropriately but requires some prodding to socialize.

Docket # 22-7 at 185.  She also stated that Rivera had no limitations in the categories of understanding and memory,[8] social interaction,[9] and adaptation.[10]  Id.

In section I of the form (Summary Conclusions), Dr. Collins-Wooley indicated, by checking boxes, that Rivera was moderately limited in four aspects of sustained concentration and persistence: the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.[11]

---

[8] The understanding and memory category comprises the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; and the ability to understand and remember detailed instructions.

[9] The social interaction category comprises the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

[10] The adaptation category comprises the ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others.

[11] Dr. Collins-Wooley indicated that Rivera was not significantly limited in any of the remaining aspects of sustained concentration and persistence, which are: the ability to carry out very short and simple instructions; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; and the ability to make simple work-related decisions.

Id. at 183-84.  Nonetheless, with respect to sustained concentration and persistence, she

explained in the Functional Capacity Assessment section that Rivera "remains able to focus

sufficiently for even simple tasks at a reasonable pace[.]"  Id. at 185.  Dr. Collins-Wooley's

written explanations in the Functional Capacity Assessment carry more weight than mere check-

the-box assessments in the Summary Conclusions portion.  See Berrios Lopez v. Sec'y of Health

& Human Servs., 951 F.2d 427, 431 (1st Cir. 1991); Dorman v. Social Sec. Admin., No. 12-

40023-TSH, 2013 WL 4238315, at *14 (D. Mass. May 21, 2013).  Moreover, an indication of

moderate limitation in the areas of sustained concentration and persistence listed above is

consistent with the ALJ's RFC limiting Rivera to no more than simple routine tasks.  See

Lacroix v. Barnhart, 352 F. Supp. 2d 100, 111 (D. Mass. 2005) (confining activities in certain

areas to "simple" matters is consistent with "moderate" limitations in those areas); see also SSA

Form HA-1152-U3 (04-2009) (defining moderate limitation as satisfactory functioning despite

more than slight limitation).

### *Residual Functional Capacity*

The ALJ is responsible for making the RFC evaluation based on all the relevant evidence,

20 C.F.R. § 404.1546(c), and she is not "precluded from rendering common-sense judgments

about functional capacity based on medical findings, as long as [she] does not overstep the

bounds of a lay person's competence and render a medical judgment[,]" Gordils v. Sec'y of

Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990) (per curiam).  After considering all

the evidence in the record, the ALJ found Rivera to have the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) except he also: must be afforded an
> option to alternate sitting and standing every 30 minutes, and is limited to
> standing/walking for 2 hours total and requires use of a cane for prolonged ambulation;
> must avoid climbing ladders/ropes/scaffolds and concentrated exposure to hazards such
> as heights and moving machinery; is limited to no more than occasional pushing and

pulling with the bilateral lower extremities; and is limited to no more than simple routine tasks.

Docket # 22-2 at 16.  In so doing, she took into account nearly all of Dr. Lightfoot's physical assessments.[12]  With respect to Rivera's mental impairments, the ALJ wrote:

> In terms of the claimant's alleged mental impairments, the medical record shows that he is diagnosed with major depressive disorder and anxiety disorder.  Treating and examining sources have observed depressed mood, anxiety, suicidal ideation, and decreased cognition [citing Docket # 22-7 at 34-128; 145-63; 165-69; Docket # 22-8 at 39-77].  However, the medical record also documents a significant history of alcohol abuse, concurrent with the aforementioned objective findings ([citing Docket # 22-7 at 34-128] drinking 3-4 times per week up to 20 drinks at a time, [citing id. at 145-63, for April and June, 2010] binge drinking several days per week, [citing id. at 165-69 for August, 2010; Docket # 22-8 at 39-77 for June, 2010] drinking 12 beers and also shots and [citing id. for October, 2010] drinking 3-4 beers and also shots, [citing id. at 100-75 for November, 2010 and January and March, 2011; Docket # 22-9 at 2-105 for August and September, 2011] drinking six or more beers at a time).  Even despite his drinking, during consultative psychological examination in August 2010, the claimant was observed to be cooperative with good persistence and intact motivation, attention, and energy level [citing Docket # 22-7 at 165-69].  Moreover, also despite alcohol use, although he alleges being unable to get out of bed several days per week, he has contradictorily repeatedly reported improved mood, and treating and examining sources have repeatedly assessed him with a global assessment of functioning score of 67, indicating mild symptoms ([citing Docket # 22-8 at 39-77 for October, 2010] reported improved mood and getting out of the house more, [citing Docket # 22-9 at 2-105 for August, 2011] GAF 67, [citing id. for September, 2011] treating and examining sources observed intact memory and concentration).

Docket  # 22-2 at 17-18.  The ALJ reasonably interpreted the range of medical opinions before her, none of which affirmatively stated that Rivera should be assigned distinct and additional impairments of limited concentration, the need to take multiple unscheduled breaks per day, or the need for health related absences of at least once per month.  To the extent such an inference could arise from the medical evidence, the ALJ considered, and supportably weighed the medical opinions and other evidence to determine that no additional impairments were warranted beyond the limitations already accounted for in restricting Rivera to simple routine tasks.  She largely

---

[12] However, she found, for example, Dr. Lightfoot's assessment that Rivera could not stoop to be unsupported by the record.  Docket # 22-2 at 17.

adopted Dr. Lightfoot's physical opinion and her findings harmonized overall with Dr. Collins-Wooley's opinion.  See Lacroix, 352 F. Supp. 2d at 111.  In the opinions of Mr. Comeaux and Dr. Schumer, Rivera's impairments were more severe than thought by Dr. Collins-Wooley.[13]  It was the ALJ's province, however, to determine issues of credibility, draw any reasonable inferences from the record, and resolve any conflicts.  See Irlanda Ortiz, 955 F.2d at 769.

      B.     The Vocational Expert Testimony

Rivera next argues that the Vocational Expert's ("VE") testimony at the hearing was insufficient to meet the ALJ's burden to show work existed in the national economy that Rivera could perform because the ALJ's hypothetical presented to the VE assumed no more than a mild mental impairment, where it did not include limited concentration, the need for multiple unscheduled breaks, and the need for at least one day per month out of work due to health problems.  The ALJ, however, presented four hypotheticals to the VE adding progressively more restrictive criteria, the last of which correlated to her final RFC determination.

First, the VE testified that Rivera's previous work as a dance hall host, karaoke host, and manager of a liquor store constituted light work, unskilled and skilled, and that Rivera's manager job involved transferrable skills such as recordkeeping and computer work.  Docket # 22-2 at 56-57.  Then, the ALJ asked the VE the following:

> Assume a person of the claimant's age, education and work experience who is limited to the light range of work as that term is defined under the Social Security regulations, would be limited in that this hypothetical person could not stand or walk for a total of more than two hours in an eight hour day.  This person must be allowed to alternate sitting and standing positions at 30 minute intervals.  Can never climb ladders, ropes or scaffolds.  Must avoid concentrated exposure to unprotected heights and hazardous machinery.  Would this hypothetical person be able to perform any of the claimant's past work?

---

[13] For example, Mr. Comeaux assessed marked limitation in understanding, remembering, and carrying out complex (or detailed) instructions, where Dr. Collins-Wooley assessed those areas as moderately limited.

Id. at 57.  The VE answered that this hypothetical person would be unable to perform Rivera's past work but could do semi-skilled sedentary and light/sedentary work of dispatcher and receptionist, and unskilled sedentary work of telemarketer.  Id. at 58-59.

Second, the ALJ added the restriction that this person would be "limited to only occasional pushing and pulling with both the left and right lower extremities, and would also be limited to occasionally handling, fingering or feeling with the left upper extremity."  Id. at 59.  The VE testified that the same three jobs would be available, but in "significantly smaller numbers."  Id.  He further testified that this person would be restricted to sedentary jobs and could perform other semi-skilled sedentary work such as billing clerk and inspector.  Id. at 59-60.

Third, the VE testified that the ALJ's added requirement of a cane for prolonged ambulation would not affect the job options for sedentary work.  Id. at 60.  Fourth, the ALJ added the restriction that this person would be limited to simple routine tasks.  The VE testified that would indicate unskilled work only, would eliminate all but the telemarketer job from the previously stated list, and further, would reduce the available telemarketer jobs to ten percent of the originally stated regional and national totals.[14]  Id. at 60-61.  Finally, the ALJ confirmed with the VE that the unskilled telemarketer work would still be available to this person, even if he were limited to occasionally handling, fingering or feeling with the left upper extremity.  Id. at 61.

Rivera's representative then asked the VE what the job outlook would be if this hypothetical person required "three to four unscheduled breaks during the day," was "unable to concentrate or focus on the task for more than an hour at a time," and was "absent on average

---

[14] The VE had testified to 1,900 unrestricted telemarketer jobs in Massachusetts and 408,000 nationally.  Id. at 59.

once a month[.]" Id. at 62-63. The VE testified that he believed these additional restrictions would preclude the job of telemarketer. Id. at 63.

Rivera argues that the ALJ erred in not accepting the testimony of the VE which was based on the final hypothetical posited by Rivera's representative. In her decision, the ALJ explained that she did not find "such additional restrictions relevant to the claimant's residual functional capacity because they are based upon the claimant's subjective allegations, which for the reasons discussed [in the RFC determination] are not supported by the record as a whole, especially in light of the claimant's significant history of alcohol use and his own reports of performing an array of activities, despite his physical and mental impairments." Docket # 22-2 at 21. Furthermore, the ALJ was under no obligation to accept the representative's hypothetical. The ALJ's hypotheticals were expressions of a range of possible RFC assessments applicable to Rivera, the final RFC assessment being wholly within the ALJ's province to determine based on all the relevant evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2), 404.1546(c), 404.1545(3). Because the ALJ's ultimate hypothetical corresponded to her reasonably founded RFC determination, she was entitled to rely on the VE's testimony regarding work in the national economy which was based on that hypothetical. See Lacroix, 352 F. Supp. 2d at 112.

C. The ALJ's Consideration of Rivera's Activities, Alcohol Use and Collection of Unemployment

Finally, Rivera asserts that the ALJ based her disability determination on Rivera's social activities, his problem with alcohol, and his collection of unemployment benefits, in contraversion of the medical evidence. The Commissioner contends that: 1) the summary dismissal of Rivera's alcohol use by Drs. Lightfoot and Schumer as unrelated to Rivera's limitations was not credible in light of Rivera's significant history of alcohol abuse, and was inconsistent with Rivera's own repeated reports that his mental health symptoms were mild and

improved; 2) the mental impairments urged by Rivera are inconsistent with his wide range of daily activities; and 3) the ALJ's consideration of Rivera's unemployment earnings was solely in the context of Rivera's credibility.

In evaluating Rivera's symptom-related functional limitations, the ALJ must take into account all relevant medical and nonmedical evidence in the record, including Rivera's statements about his symptoms, his daily activities, and any other factors concerning his functional limitations and restrictions. See 20 C.F.R. § 404.1529(c)(3). The ALJ noted that Rivera alleges disability because of arthritis, carpal tunnel syndrome, asthma, sleep apnea, hypertension, diabetes with neuropathy, HIV, depression, and anxiety. Docket # 22-2 at 16. He reports difficulty with a variety of physical movement, need for a cane, staying in bed several days per week, sleep disturbance, decreased memory, and being unable to concentrate for more than 10-15 minutes at a time, as well as side effects from medication including diarrhea. Id.

After weighing all the relevant evidence in the record, the ALJ found that Rivera had no more than mild restriction in activities of daily living due to mental symptoms in light of his own reports of hosting karaoke at a bar several times per week, having a partner, going camping, socializing, doing household chores, going to the gym, driving, having friends, going to the beach, and going fishing. Docket # 22-2 at 18. Similarly, the ALJ found that Rivera had mild difficulties in social functioning due mental symptoms. Id. at 18-19. She found that Rivera had "experienced no episodes of decompensation of extended duration" because "[t]he medical record contains no evidence of any partial or inpatient psychiatric hospitalizations unrelated to substance use." Id. at 19. As to concentration, persistence, and pace, she limited Rivera to:

> no more than simple routing work in light of his underlying depressive and anxiety
> disorders. However, I find that he has no more than mild to moderate difficulties in this
> area of functioning and can still perform the basic mental demands of simple routine
> work in light of the medical record showing a significant history of alcohol abuse

concurrent with the aforementioned objective findings of impaired cognition, as well as the claimant's own reports to treating and examining sources of improved symptoms, as discussed above. Moreover, despite his mental impairments, the claimant has been able to concentrate sufficiently to perform an array of activities, . . .

Id. The ALJ properly factored these considerations into her determination of Rivera's RFC. See 20 C.F.R. § 404.1529(c)(3).

Finally, the ALJ did not base her disability determination on Rivera's receipt of unemployment benefits, as Rivera suggests. She acknowledged that unemployment earnings do not preclude receiving disability benefits. Docket # 22-2 at 18. She highlighted, however, as being inconsistent with Rivera's disability claim, that in order for Rivera to collect unemployment earnings, he had to "certify under penalty of law that he was willing and able to work to receive these payments." Id.

IV.    CONCLUSION

For the foregoing reasons, I RECOMMEND that the court DENY the Plaintiff's Motion to Reverse or Remand the Decision of the Commissioner (Docket # 17) and ALLOW the Commissioner's Motion to Affirm the Commissioner's Decision (Docket # 19).[15]


/s/ Leo T. Sorokin
Leo T. Sorokin
Chief United States Magistrate Judge

---

[15] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within fourteen days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72; 28 U.S.C. § 636(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).